IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) ) ) |
| v. | ) Civil Action No. 21-cv-288-JFH ) |
| AMETHYST RESEARCH, INC., | ) ) |
| Defendant. | ) |

# COMPLAINT

The Plaintiff, the United States of America *ex rel.* the United States Department of Defense and the National Aeronautics and Space Administration (the "United States"), by and through Christopher J. Wilson, Acting United States Attorney for the Eastern District of Oklahoma, and Michael O'Malley, Assistant United States Attorney, for its Complaint against Amethyst Research, Inc. an Oklahoma corporation, allege and state:

## NATURE OF ACTION

1. This is an action brought by the United States to recover damages and civil penalties under the False Claims Act (FCA), 31 U.S.C. §§ 3729-33, to recover damages and other monetary relief for common law or equitable causes of action for payment under mistake of fact, breach of contract, fraud, and unjust enrichment. Each of these legal claims results from defendant submitting claims for monetary reimbursement to the Department of Defense and the National Aeronautics and Space Administration for services that were not done as claimed or for services specifically disallowed pursuant to Federal Acquisition Regulations and/or the plain terms of the contracts at issue.

## JURISDICTION, VENUE, AND PARTIES

2. This action arises under the False Claims Act and under the common law.

1

3. The plaintiff brings this action on behalf of the United States Department of Defense ("DoD"), an executive branch department of the federal government charged with coordinating and supervising agencies and functions of the government directly related to national security and the United States Armed Forces, and the National Aeronautics and Space Administration ("NASA"), an executive branch agency of the federal government responsible for the civilian space program, as well as aeronautics and aerospace research. Jurisdiction is vested in this court by virtue of 28 U.S.C. § 1345, 31 U.S.C. § 3732(a), and 28 U.S.C. § 1391(b),

4. Venue is proper because a substantial part of the events giving rise to these claims occurred within the Eastern District of Oklahoma. 28 U.S.C. §1395(a) and 31 U.S.C. § 3732(a).

5. Defendant Amethyst Research, Inc. ("ARI") is an Oklahoma corporation incorporated on April 7, 2004. Dr. Terry Golding is the co-founder, CEO and Chief Technology Officer of Amethyst. Amethyst is located at 123 Case Circle, Ardmore, Oklahoma 73401.

6. ARI is a small business research company that specializes in infrared sensors, electro-optical materials processing, and device design with commercial, scientific, and military applications. The practical applications of their technology include night vision devices, ultra-high performance infrared detectors, and high-resolution gas sensors. ARI has applied for and received federal and state grants and contracts in excess of $21 million dollars since 2004.

7. At all times relevant to these allegations, Terry Golding, in addition to his interest in Amethyst, had financial control of four Texas corporations, AquaMesa Corporation, AquaMesa Corporation I, AquaMesa Corporation II, and AquaMesa Corporation III (generally "AMC"). Golding acted as a C-level executive for these entities. Each corporation maintained separate bank accounts and were located at the same address in San Marcos, Texas.

## THE DEPARTMENT OF DEFENSE CONTRACT PROGRAM

8. Under a cost-reimbursement contract, a DoD contractor is entitled to reimbursement for both its direct allowable costs, such as labor costs on a contract, and a prorated portion of its indirect allowable costs, such as rent for the contractor's facilities. Indirect costs must be pro-rated across multiple contracts; therefore, those costs cannot be accurately determined until the end of the contractor's fiscal year.

9. Consequently, under a cost reimbursement contract, a contractor initially submits claims for indirect costs based on provisional or estimated rates, and later submits its actual indirect costs to the DoD for review, reconciliation, and approval. The later proposal, known as the incurred cost submission ("ICS"), reflects what the contractor certifies were its actual allowable costs for the prior fiscal year.

10. The Federal Acquisition Regulations Cost Principles Guide ("FAR") mandates the allowability, reasonableness, and allocability of contractor costs in addition to other germane considerations.

11. FAR 31.201-2 addresses allowability:

>  (a) A cost is allowable only when the cost complies with all of the following requirements:
>  (1) Reasonableness.
>  (2) Allocability.
>  (3) Standards promulgated by the Cost Accounting Standards Board, if applicable, otherwise, generally accepted accounting principles and practices appropriate to the circumstance.
>  (4) Terms of the contract.
>  (5) Any limitations set forth in this subpart.

12. FAR 31.201-2 states, in pertinent part:

> (d) A contractor is responsible for accounting for costs appropriately and for maintaining records, including supporting documentation, adequate to demonstrate that costs claimed have been incurred, are allocable to the contract, and comply with applicable cost principles in this subpart and agency supplements.

13. FAR 31.201-3 addresses reasonableness:

A cost is reasonable if, in its nature and amount, it does not exceed that which would be incurred by a prudent person in the conduct of competitive business. Reasonableness of specific costs must be examined with particular care in connection with firms or their separate divisions that may not be subject to effective competitive restraints. No presumption of reasonableness shall be attached to the incurrence of costs by a contractor. If an initial review of the facts results in a challenge of a specific cost by the contracting officer or the contracting officer's representative, the burden of proof shall be upon the contractor to establish that such cost is reasonable.

> (a) What is reasonable depends upon a variety of considerations and circumstances, including-
> (1) Whether it is the type of cost generally recognized as ordinary and necessary for the conduct of the contractor's business or the contract performance;
> (2) Generally accepted sound business practices, arm's-length bargaining, and Federal and State laws and regulations;
> (3) The contractor's responsibilities to the Government, other customers, the owners of the business, employees, and the public at large; and
> (4) Any significant deviations from the contractor's established practices.

14. FAR 31-201-4 addresses allocability. The regulation states:

A cost is allocable if it is assignable or chargeable to one or more cost objectives on the basis of relative benefits received or other equitable relationship. Subject to the foregoing, a cost is allocable to a Government contract if it-
> (a) Is incurred specifically for the contract;
> (b) Benefits both the contract and other work, and can be distributed to them in reasonable proportion to the benefits received; or
> (c) Is necessary to the overall operation of the business, although a direct relationship to any particular cost objective cannot be shown.

15. FAR 31.205-33 addresses professional and consultant service costs. The regulation states, in part:

(a) Definition. Professional and consultant services, as used in this subsection, means those services rendered by persons who are members of a particular profession or possess a special skill and **who are not officers or employees of the contractor** [emphasis added]. Examples include those services acquired by contractors or subcontractors in order to enhance their legal, economic, financial,

4

or technical positions. Professional and consultant services are generally acquired to obtain information, advice, opinions, alternatives, conclusions, recommendations, training, or direct assistance, such as studies, analyses, evaluations, liaison with Government officials, or other forms of representation.

16. FAR 3l.205-33(c)(4) states, in substance, that professional and consultant services costs are unallowable if the services performed are inconsistent with the purpose and scope of the services contracted for or otherwise agreed to.

17. FAR 31.205-33 further states, in relevant part:

> (f) Fees for services rendered are allowable only when supported by evidence of the nature and scope of the service furnished. However, retainer agreements generally are not based on statements of work. Evidence necessary to determine that work performed is proper and does not violate law or regulation shall include-
> (1) Details of all agreements (*e.g.*, work requirements, rate of compensation, and nature and amount of other expenses, if any) with the individuals or organizations providing the services and details of actual services performed;
> (2) Invoices or billings submitted by consultants, including sufficient detail as to the time expended and nature of the actual services provided; and
> (3) Consultants work products and related documents, such as trip reports indicating persons visited and subjects discussed, minutes of meetings, and collateral memoranda and reports.

18. The Defense Contract Audit Agency ("DCAA") provides audit and financial advisory services to DoD and other federal entities responsible for acquisition and contract administration. The DCAA's primary function is to conduct contract audits and related financial advisory services. Contract audits are independent, professional reviews of financial representations made by defense contractors, and DCAA helps determine whether contract costs are allowable, allocable, and reasonable.

**FACTS RELATED TO THE DEPARTMENT OF DEFENSE CONTRACT PROGRAM**

19. ARI had numerous DoD cost reimbursement contracts in fiscal years 2009, 2010, 2011, and 2012.

20. On July 20, 2016, the DCAA issued Audit Report No. 3161-2010N10100003, Independent Audit Report on Amethyst Research, Inc.'s Proposed Amounts on Unsettled Flexibly Priced Contracts for Fiscal Year 2010. This audit reported deficiencies in multiple areas. In particular, the audit questioned consultant costs.

21. Consultant fees billed by AquaMesa to ARI were voluntarily deleted by ARI from the Fiscal Year ("FY") 2009's incurred cost proposal due to the cost being considered unallowable. In that cost proposal, ARI stated AquaMesa Corp. acted as the business office for the Austin, TX branch and helped with development and program/proposal development.

22. A review of ARI's consultant agreement with AquaMesa indicates that the signee of the consulting agreement, Dr. Terry Golding, was listed as an indirect employee with significant hours billed to DoD contracts in FY 2010.

23. Thus, Golding was both paid wages for indirect labor as an employee of ARI and was paid as a consultant with AquaMesa Corp. during the same time frame.

24. AquaMesa Corp. consulting costs totaled $230,553 in FY 2010.

25. On October 31, 2016, the DCAA issued Audit Report Nos. 4561-2011Nl0100002 and 4561-2012Nl0100010, Independent Audit Report on Amethyst Research, Inc.'s Proposed Amounts on Unsettled Flexibly Priced Contracts for Fiscal Year 2011 and 2012. Like the FY2010 audit, the DCAA identified multiple areas of concern including AMC's consulting fees as a potential noncompliance issue.

26. AquaMesa Corp. consulting costs totaled $31,500 in FY 2011. No consulting fees were charged by AquaMesa in FY 2012.

27. On September 30, 2015, Dr. Golding, acting on behalf of ARI, falsely certified to the DCAA that the earlier incurred cost submissions attributed to contractor AquaMesa were allowable in accordance with the cost principles of the FAR or its supplements.

28. The certificate, signed by Golding on behalf of ARI, stated the following:

This is to certify that I have reviewed this proposal to establish final indirect cost rates and to the best of my knowledge and belief:

(1) All costs included in the proposal, ICS Report for 2010, to establish final indirect cost rates for 2010 are allowable in accordance with the cost principles of the Federal Acquisition Regulation (FAR) and its supplements applicable to the contracts to which the final indirect cost rates will apply; and
(2) This proposal does not include any costs which are expressly unallowable under applicable cost principles of the FAR or its supplements.

29. An identical certificate, concerning the ICS report for FY 2011 and 2012, was also executed by Dr. Golding on September 30, 2015.

## THE NASA CONTRACT PROGRAMS

30. The Small Business Technology Transfer ("STTR") is a program that expands funding opportunities in the federal innovation research and development arena. Central to the program is expansion of the public/private sector partnership to include the joint venture opportunities for small businesses and nonprofit research institutions.

31. The unique feature of the STTR program is the requirement for the small business to collaborate with a research institution in Phase I and Phase II. STTR's role is to bridge the gap between performance of basic science and commercialization of resulting innovations

32. The Small Business Innovation Research ("SBIR") program is a highly competitive program that encourages domestic small businesses to engage in federal research/research and development that has the potential for commercialization. Through a competitive award process,

SBIR enables small businesses to explore their technological potential and provides the incentive to profit from commercialization.

33. By including qualified small businesses in the nation's research and development arena, high-tech innovation is stimulated, and the United States gains entrepreneurial spirit as it meets its specific R&D needs.

## FACTS RELATED TO THE NASA CONTRACT PROGRAMS

34. On September 12, 2014 Amethyst was awarded an (STTR) Phase II, contract number NNX14CP72C ("72C"), valued at $749,985, which included a $225,000 subcontract to the University of Oklahoma ("OU") as the designated Research Institution ("RI"). (*See* 72C Contract attached as Exhibit 1).

35. Two of the contract terms were to (1) provide a description of any changes to the planned use of subcontractors since contract award in the demonstration reports and (2) for a RI to perform 30 percent of the work under the contract.

36. Amethyst submitted eight quarterly demonstration reports and one final report throughout the term of the STTR to summarize the contract performance. The first six quarterly demonstration reports, stated there were no changes to the planned use of subcontractors since contract award.

37. Based on the demonstration reports provided, on January 29, 2016 the NASA contracting officer reached out to ARI, reminding them that OU was to perform 30 percent of the work under the contract.

38. ARI acknowledged the concerns and stated they would contact the contracting officer if OU was not used as the designated research institution. ARI then proceeded to omit any statements regarding changes to the planned use of subcontractors on the final two quarterly

reports. ARI reaffirmed on the final report that there were no changes to the planned use of subcontractors since contract award.

39. The OU subcontract file disclosed that the subcontract amount, originally proposed for $225,000, was subsequently unilaterally reduced to $93,981 by ARI. The RI ultimately performed 12.5 percent of the contract work, well below the contractually required amount for RIs of 30 percent.

40. On May 1, 2016 Amethyst was awarded an SBIR, contract number NNX16CG23P ("23P"), valued at $124,999 in which ARI proposed $72,595 of labor for key personnel. (*See* 23P Contract attached as Exhibit 2).

41. A material term of the 23P contract was that certain research and development be completed by key personnel. The contract stated, "[b]efore removing, replacing or diverting any of the listed or specified personnel or facilities, the contractor shall (1) notify the Contracting Officer reasonably in advance and (2) submit justification." It also provided that "[t]he contractor shall make no diversion with the Contracting Officer's written consent."

42. Based on incurred cost submissions, total labor costs for SBIR 23P were $17,752, indicating that labor was not completed by key personnel.

43. The Contracting Officer was never notified of any diversion of Key Personnel.

## FIRST CAUSE OF ACTION
## FALSE CLAIMS ACT, 31 U.S.C. §§ 3729-3733

44. The United States re-alleges and incorporates the preceding paragraphs.

45. Amethyst knowingly presented false or fraudulent claims to the United States for payment in violation of the FCA, 31 U.S.C. § 3729(a)(1). Specifically, on September 30, 2015, Dr. Golding, acting on behalf of ARI, falsely certified to the DCAA that the earlier incurred cost submissions attributed to contractor AquaMesa were allowable in accordance with the cost principles of the FAR or its supplements. This claim was false or fraudulent because the claim was

9

unallowable pursuant to FAR 31.205-33(a).  Moreover, ARI was put on notice that the claim was unallowable and removed AquaMesa consulting fees from its FY 2009 incurred cost submissions.

46.     The word "knowingly" as used in this Complaint is defined in the False Claims Act as "a person, with respect to information, who - (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b).

47.     The United States suffered actual damages in an amount to be determined at trial and is entitled to treble damages and civil penalties under the False Claims False Claims Act, 31 U.S.C. § 3729 *et seq*. as amended.

## SECOND CAUSE OF ACTION
## FALSE CLAIMS ACT, 31 U.S.C. §§ 3729-3733

48.     The United States re-alleges and incorporates the preceding paragraphs.

49.     Amethyst knowingly presented false or fraudulent claims to the United States for payment in violation of the FCA, 31 U.S.C. § 3729(a)(1).  Specifically, ARI submitted eight quarterly demonstration reports to NASA and one final report throughout the term of the STTR to summarize the contract performance. Six of the quarterly demonstration reports, as well as the final report, stated there were no changes to the planned use of subcontractors since contract award, the remaining two reports omitted any reference to the planned use of subcontractors.  NASA utilized these demonstration reports as the deliverables and support for invoice payments throughout the contract.  Since ARI unilaterally changed the planned use of OU as a subcontractor, and did not notify the Contracting Officer, NASA paid six invoices based on false or fraudulent representations.  Further, OU ultimately performed 12.5 percent of the contract work, well below the contractually required amount for RIs of 30 percent despite ARI providing a certification to the contrary.

50. The United States suffered actual damages in an amount to be determined at trial and is entitled to treble damages and civil penalties under the False Claims False Claims Act, 31 U.S.C. § 3729 *et seq*. as amended.

### THIRD CAUSE OF ACTION
### FALSE CLAIMS ACT, 31 U.S.C. §§ 3729-3733

51. The United States re-alleges and incorporates the preceding paragraphs.

52. Amethyst knowingly presented false or fraudulent claims to the United States for payment in violation of the FCA, 31 U.S.C. § 3729(a)(1). Specifically, ARI submitted a request to payment to NASA for the SBIR, 23P contract based upon $72,595 of labor for key personnel. These claims were false or fraudulent because total labor costs for SBIR 23P were $17,752, indicating that labor was not completed by key personnel.

53. The United States suffered actual damages in an amount to be determined at trial and is entitled to treble damages and civil penalties under the False Claims False Claims Act, 31 U.S.C. § 3729 *et seq*. as amended.

### FOURTH CAUSE OF ACTION
### BREACH OF CONTRACT

54. The United States re-alleges and incorporates the preceding paragraphs.

55. ARI entered into a contract with NASA, an (STTR) Phase II, contract number NNX14CP72C. Under the terms of the contract, ARI was to (1) provide a description of any changes to the planned use of subcontractors since contract award in the demonstration reports and (2) for a research institution to perform 30 percent of the work under the contract as a subcontractor. ARI breached that agreement and the United States has suffered harm as a result.

56. The United States is entitled to the return of payments in the amount of $155,682 due to ARI's breach of the contract.

## FIFTH CAUSE OF ACTION
## BREACH OF CONTRACT

57.     The United States re-alleges and incorporates the preceding paragraphs.

58.     ARI was awarded an SBIR, contract number NNX16CG23P ("23P"), valued at $124,999 in which ARI proposed $72,595 of labor for key personnel. A material term of the 23P contract was that certain research and development be completed by key personnel. The contract also provided that the contractor shall make no diversion of labor without the contracting officer's written consent. Based on incurred cost submissions, total labor costs for SBIR 23P were reduced to by ARI $17,752, indicating that labor was not completed by key personnel. Further, no written consent was obtained for the change.

59.     The United States is entitled to the return of payments in the amount of $92,274 due to ARI's breach of the contract.

## SIXTH CAUSE OF ACTION
## UNJUST ENRICHMENT

60.     The United States re-alleges and incorporates the preceding paragraphs.

61.     As a result of the conduct described above, ARI was paid federal funds to which it was not entitled.

62.     In consequence of the acts set forth above, ARI has been unjustly enriched at the expense of the United States under circumstances directing that in equity and good conscious, the money should be returned to the United States.

## SEVENTH CAUSE OF ACTION
## PAYMENT BY MISTAKE OF FACT

63.     The United States re-alleges and incorporates the preceding paragraphs.

64.     As a result of the conduct described above, the Defendant was paid federal grant monies that were not properly payable.

65.     At the time such payments were made, the United States was not aware of the Defendant's wrongful conduct and factual misstatements. Had the DoD or NASA known that ARI contract monies were being misappropriated, such funds would not have been paid. All such payments were made to ARI by mistake of fact.

66.     As a consequence, the United States is entitled to recover those funds which were paid to Defendant by mistake of fact.

**EIGHTH CAUSE OF ACTION**
**COMMON LAW FRAUD**

67.     The United States re-alleges and incorporates the preceding paragraphs.

68.     In 2010 and 2011 ARI knowingly received billed DoD contracts for consulting services performed by AquaMesa as a result of its failure to notify DoD that Dr. Terry Golding was a principal of both ARI and AquaMesa. In fact, ARI knew or should have known that by not notifying DoD about the relationship between ARI, Aquamesa and Dr. Terry Golding, DoD would continue to make payments on DoD contracts for consulting services performed by AquaMesa, giving ARI access to funds to which he was not legally entitled.

69.     ARI fraudulently concealed material facts intending to induce the United States to rely thereon.

**NINTH CAUSE OF ACTION**
**COMMON LAW FRAUD**

70.     The United States re-alleges and incorporates the preceding paragraphs.

71.     In 2014 through 2016 ARI knowingly accepted payments on NASA contracts while concealing the scope and use of subcontractors and the use of key personnel on certain contracts. ARI knew or should have known that by not disclosing these facts to NASA, NASA would

continue to make payments on the contracts, giving ARI access to funds to which he was not legally entitled.

72. ARI fraudulently concealed material facts intending to induce the United States to rely thereon.

## CONCLUSION

WHEREFORE, the United States prays that that the Court grant judgment for the Plaintiff against the Defendant as follows:

1. For civil penalties for each false claim, pursuant to 31 U.S.C. § 3729(a);

2. For three times the amount of actual damages proved pursuant to 31 U.S.C. § 3729(a) for payments made pursuant to a false claim;

3. For damages proved for payments made under breach of contract, fraud, mistake of fact, or unjust enrichment; and

4. For reasonable attorney's fees, costs, and expenses incurred by the United States in prosecuting this action;

5. Post-judgment interest at the rates permitted by law; and

6. For such other and further relief as may be appropriate and authorized by law.

Respectfully,

CHRISTOPHER J. WILSON
Acting United States Attorney

*s/ Michael J. O'Malley*
MICHAEL J. O'MALLEY, OBA #22252
Assistant United States Attorney
520 Denison Avenue
Muskogee, OK 74401
(918) 684-5176
(918) 684-5130 – fax
michael.o'malley@usdoj.gov